T.C. Memo. 2018-110

UNITED STATES TAX COURT

MARTIN W. WASHBURN, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13304-16L.                    Filed July 12, 2018.

<u>Richard Todd Luoma</u>, <u>Betty J. Williams</u>, and <u>Matthew D. Carlson</u>, for petitioner.

<u>Bryant W. Smith</u> and <u>Trent D. Usitalo</u>, for respondent.

MEMORANDUM OPINION

LEYDEN, <u>Special Trial Judge</u>:  The Internal Revenue Service (IRS) Office of Appeals (Appeals Office) issued petitioner a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 (notice of

[*2] determination) dated May 10, 2016.[1]  The notice of determination sustained a proposed levy with respect to petitioner's unpaid income tax liability for 2014.

The parties stipulated that if the Court determines that petitioner is liable for the underlying income tax liability for 2014, then the proposed levy is appropriate. Therefore, the sole issue for decision is whether petitioner is entitled to a miscellaneous itemized deduction of $400,000 for restitution payments he made in 2014.  The Court holds that petitioner is not entitled to the miscellaneous itemized deduction.

## Background

The parties submitted this case fully stipulated pursuant to Rule 122. Petitioner resided in California when he timely filed his petition.

## I.    Overseas Private Investment Corporation Loan

In 1982 petitioner founded FoodPro International, Inc. (FoodPro), a California corporation, and was its president at all times relevant to this case.[2] FoodPro owned 50.46% of Golden Sierra Partners, LLC (GSP), a Nevada limited

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The record does not indicate how FoodPro was taxed for Federal tax purposes.

**[*3]** liability company.[3]  Two other entities owned the remaining interests in GSP.  Petitioner was the corporate secretary of GSP at all times relevant to this case.

Petitioner and four other individuals (hereinafter sometimes collectively referred to as codefendants) participated in a scheme to defraud the Overseas Private Investment Corporation (OPIC) to obtain a loan of about $9.4 million for GSP.  In March 2003 petitioner, in his capacity as the corporate secretary of GSP, submitted an application to OPIC for the loan to fund GSP's milling and bakery operation in Estonia.  FoodPro was GSP's U.S. sponsor for purposes of the OPIC loan.[4]  The loan application stated that GSP would be capitalized with approximately $16.5 million.  Slightly more than one-half of GSP's milling and bakery operation would be funded by the loan from OPIC and the remaining

---

[3]The record does not indicate how GSP was taxed for Federal tax purposes.

[4]According to the indictment and superseding indictment:

[OPIC] was a United States governmental agency * * * whose mission was to encourage U.S.-based companies to invest in overseas business projects.  To do so, OPIC provided, among other things, loans to small businesses for investments in overseas projects.  To qualify for a small business loan, the U.S. business, also called the "U.S. Sponsor," had to own at least 25% of the overseas project.  To apply for a small business loan, the borrower had to submit an application form, including a detailed business plan and cash flow projections, and each sponsor of the borrower had to complete and submit a Sponsor Disclosure Report.

[*4] amount would be funded by investment contributions to GSP by FoodPro, as represented by petitioner in his capacity as president of FoodPro, and GSP's two other owners. In September 2003 OPIC and GSP signed a loan agreement in which OPIC agreed to lend GSP about $9.4 million. OPIC made two loan disbursements, totaling $7,918,486, by wire transfers in 2003 and 2004 to GSP's bank account.

In 2004 GSP constructed a grain drying facility in Vahenurme, Estonia, and purchased a bakery in Valga, Estonia. During 2004 and 2005 GSP undertook the construction of a mill in Viljandi, Estonia. As the project progressed, GSP made regular loan interest payments.

Thereafter disputes arose over the management and control of the milling and bakery operation. It was during the course of these disputes that OPIC discovered that GSP had misrepresented certain facts in its loan application. Contrary to the statements in the loan application, the investment contributions to GSP by FoodPro and one other GSP owner were in substance a disguised loan from one of the codefendants. Petitioner and his codefendants withheld bank statements from OPIC that showed that the investment contributions by FoodPro and one other GSP owner were immediately distributed to the codefendant who made the loan.

**[*5]**   The loan application also misstated the estimated equipment prices and reported that FoodPro did not own any related companies.  The estimated equipment prices reported in the loan application were seriously overstated, and GSP purchased the equipment from companies that were related to FoodPro. Petitioner and his codefendants:  (1) submitted falsified invoices to OPIC that listed the overstated equipment prices, (2) concealed the close relationship between FoodPro and the companies from which the equipment was purchased, (3) made false assurances to OPIC with respect to the progress of the project, and (4) falsely affirmed the accuracy of their disclosures to OPIC.

In March 2005, after OPIC discovered the misrepresentations, petitioner and GSP's chief executive officer, one of the codefendants, met with representatives from OPIC.  They agreed that OPIC would repossess all of GSP's assets, which OPIC valued at $4,750,000, in an attempt by OPIC to recoup what it had lent GSP. At that time GSP's assets included the Viljandi mill, the Vahenurme grain drying facility, and the Valga bakery.  OPIC also recovered $1,045,550 of cash remaining from OPIC's loan in GSP's bank account.[5]

---

[5]The record indicates that the Estonian Government refunded $135,867.84 in value-added tax (VAT) to "the government".  It is not clear whether, in turn, OPIC, a U.S. governmental agency, received this amount.

[*6] II.     Criminal Proceedings

On May 3, 2011, petitioner, in connection to his actions on behalf of GSP and FoodPro, pleaded guilty to one count of conspiring to commit mail and wire fraud, see 18 U.S.C. sec. 1349 (2006), and to one count of conspiring to commit money laundering, see 18 U.S.C. sec. 1956(h) (2006).  On August 30, 2011, the District Court entered its amended judgment in the criminal case against petitioner and ordered imprisonment, restitution, and forfeiture but expressly declined to order a fine.[6]

A.     Imprisonment

The District Court sentenced petitioner to 12 months' imprisonment for each of the two counts, to run concurrently.  Upon the completion of the 12 month-imprisonment, petitioner would be on supervised release for three years on each of the two counts, to run concurrently.  During the first 12 months of supervised release petitioner was required to serve in-home detention with electronic monitoring.

---

[6]On June 20, 2011, the District Court entered its initial judgment as to petitioner in the criminal case.  See infra note 8.  On August 9, 2011, the District Court issued an order to amend its judgment with respect to the amount of restitution and forfeiture.  This order was followed by the amended judgment entered on August 30, 2011.

[*7]   B.   <u>Restitution</u>

During the sentencing hearing held on June 14, 2011, the District Court, petitioner, his codefendants, and the Government focused on OPIC's total loss to calculate the amount of restitution to impose.  The Government argued for restitution of $6,913,219.50 while petitioner and his codefendants argued for restitution of $1,398,434.16.

The Government calculated the proposed restitution amount of $6,913,219.50 by aggregating the loan disbursements of $7,918,486 from OPIC; payments of $656,264.76 by OPIC to a contractor to complete the bakery for purposes of resale; and legal, engineering, and other fees of $813,090.84 incurred by OPIC and reducing that total by the $1,045,550 recovered from GSP's bank account, the $135,867.84 of refunded VAT, and the actual proceeds of $1,293,204.26 OPIC received from the sale of GSP's assets.

Petitioner and his codefendants calculated the proposed restitution amount of $1,398,434.16 by aggregating the loan disbursements of $7,918,486 from OPIC and reducing that total amount by the $1,045,550 recovered from GSP's bank account, the $135,867.84 of refunded VAT, the $588,634 of regular interest payments GSP had already made to OPIC on the loan, and the $4,750,000 at

[*8] which OPIC valued GSP's assets (excluding cash) at the time it repossessed all of GSP's assets.[7]

The District Court ultimately determined that the total amount of restitution owed to OPIC was $2 million,[8] closer to the amount proposed by petitioner and his codefendants. This amount was apportioned between petitioner and three of his codefendants. Specifically, petitioner was ordered to pay restitution of $750,000

---

[7]Petitioner and his codefendants valued GSP's assets at $4,750,000 and argued that, although OPIC eventually sold the assets for less than $4,750,000, OPIC had many reasons for doing so but that those reasons were not driven by market prices. The Government argued that the value of GSP's assets should be equal to the proceeds OPIC actually received from the sale of GSP's assets. The Government argued that the market value for the assets it was able to recover was the more reliable amount.

[8]In its initial judgment the District Court determined that the total amount of restitution was $2,054,698 and ordered petitioner and his codefendants jointly and severally liable. The record does not specify how the District Court arrived at this amount of restitution. However, the Court takes notice that petitioner and his codefendants' proposed restitution of $1,398,434.16 increased by OPIC's payments of $656,264.76 to the contractor to complete the bakery for purposes of resale equals $2,054,698.92. The Court therefore infers that the District Court arrived at the total amount of restitution of $2 million because it was closer to the amount petitioner and his codefendants recommended as adjusted to reflect amounts OPIC paid to complete the bakery for purposes of resale.

The determination of how the restitution would be apportioned was deferred for 60 days after sentencing to allow petitioner and his codefendants time to provide the probation officer with documentation about their income and liabilities and to submit arguments as to the apportionment of the restitution.

[*9] for his criminal conduct in obtaining the loan and loan disbursements from OPIC to fund GSP's milling and bakery operation in Estonia.

### C.     Forfeiture

The District Court also ordered petitioner to forfeit his interest in unspecified property.  The amount of this forfeiture, due under 18 U.S.C. sec. 982(a)(1) (2006), was to be $750,000, the same amount as the restitution.  If petitioner paid the full restitution, he would not have to forfeit his interest in the unspecified property.

### D.     Fines

The District Court expressly declined to impose a fine on petitioner.  It did impose a special assessment of $100 on each of the two counts.

## III.    Restitution Payments

As relevant in this case, in March 2014 petitioner made four restitution payments totaling $400,000 in the following amounts:  (1) $240,000 from an individual retirement account (IRA) in petitioner's name, (2) $30,000 from a second IRA in petitioner's name, (3) $30,000 from an investment account in petitioner's name, and (4) $100,000 from another investment account in petitioner's and someone else's name as trustees for the business of FoodPro.

**[*10]** IV.     <u>2014 Tax Return and Levy Notice</u>

Petitioner timely filed a 2014 Form 1040, U.S. Individual Income Tax Return.  Among other things, petitioner reported wages and attached to the tax return a Form W-2, Wage and Tax Statement, from FoodPro.  Petitioner did not report any business income or loss from a Schedule C, Profit or Loss From Business.  A Schedule E, Supplemental Income and Loss, attached to the 2014 tax return did not report either FoodPro or GSP as entities from which petitioner received income or incurred a loss.  In the 2014 tax return petitioner reported a total tax of $111,222, a Federal income tax withholding credit of $16, and estimated tax payments of $400,000 (the amount he had paid in restitution during 2014), resulting in an overpayment of $288,794.

On May 18, 2015, the IRS mailed petitioner a Notice CP23, Changes to your 2014 Form 1040, informing petitioner that its records did not show that petitioner had made any estimated tax payments for that year.  The Notice CP23 removed the $400,000 of estimated tax payments petitioner had reported on the 2014 tax return.  The Notice CP23 also notified petitioner that the IRS had assessed the reported total tax, additions to tax under sections 6651(a)(2) and 6654(a), and interest for 2014 and demanded payment.

[*11] On October 12, 2015, the IRS mailed petitioner a Notice CP90, Intent to seize your assets and notice of your right to a hearing, with respect to his unpaid income tax liability for 2014. In response petitioner timely filed a Form 12153, Request for a Collection Due Process or Equivalent Hearing, to challenge the proposed levy. In the Form 12153 he checked the box for "I Cannot Pay Balance" as a collection alternative. In the "other" section he wrote, among other things: "My claim (and tax return) is that the government owes me more than $200,000. The professional who prepares my tax return wrote to the IRS to point out a mistake they made".

During the collection due process (CDP) hearing, petitioner abandoned his argument that the restitution payments he made constituted estimated tax payments. Instead, he argued that the restitution payments should have been reflected as credits against his tax for 2014 under section 1341. The Appeals Office rejected petitioner's argument and issued the notice of determination, sustaining the proposed levy with respect to the unpaid income tax liability for 2014.

Petitioner timely filed a petition seeking review of the notice of determination. Petitioner concedes that the restitution payments are not estimated tax payments or credits against his tax under section 1341. Instead, in the joint

[*12] first stipulation of facts and joint stipulation of settled issues the parties

stipulated: "Petitioner's current position is that he is entitled to a miscellaneous

deduction in the amount of $400,000 for the taxable year 2014 for his restitution

payments."

Discussion

In reviewing an administrative determination in a CDP case if the

underlying tax liability is properly in dispute, the Court reviews the determination

regarding the underlying tax liability de novo. Goza v. Commissioner, 114 T.C.

176, 181-182 (2000). The Court reviews the Appeals Office's determination

regarding petitioner's underlying income tax liability de novo because the parties

agree that petitioner did not receive a notice of deficiency for 2014,[9] did not have a

---

[9]Generally, sec. 6213(a) restricts the Commissioner from assessing or taking action to collect any deficiency in tax until after he has mailed to the taxpayer a statutory notice of deficiency. Section 6213(b)(1) provides an exception for assessments arising out of the taxpayer's mathematical or clerical errors. Generally, the Commissioner need not issue a statutory notice of deficiency before assessing a tax on account of a mathematical or clerical error appearing on a tax return. Sec. 6213(b)(1). However, if the taxpayer requests an abatement of the assessment within 60 days of the notice of the mathematical or clerical error, the Commissioner must abate the assessment and must use deficiency procedures to reassess. Sec. 6213(b)(2)(A).

Internal Revenue Manual pt. 21.5.4.2.1(1)(a) (Oct. 1, 2011) explains that "[a] correction to withholding or estimated payments" is not considered a mathematical or clerical error "for purposes of the 60-day abatement request". Therefore the IRS' adjustments to petitioner's 2014 tax return in the Notice CP23,

(continued...)

**[\*13]** prior opportunity to challenge the underlying income tax liability, and properly raised the issue of the underlying income tax liability during the CDP hearing. See sec. 6330(c)(2)(B); Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. at 181-182.

Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any deduction claimed. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). The taxpayer claiming a deduction must demonstrate that the deduction is allowable pursuant to some statutory provision and must further substantiate that the expense to which the deduction relates has been paid or incurred.[10] See sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976); sec. 1.6001-1(a), Income Tax Regs.

## I. Stipulations

The stipulation process is considered "the bedrock of Tax Court practice" and acts "as an aid to the more expeditious trial of cases". Branerton Corp. v.

---

[9](...continued)
see supra p. 10, were not subject to deficiency procedures.

[10]The Court concludes, and the parties do not dispute, that petitioner has substantiated that he made four restitution payments totaling $400,000 in 2014.

**[\*14]** <u>Commissioner</u>, 61 T.C. 691, 692 (1974).  Stipulations narrow controversies to their essential issues in dispute.  <u>Estate of Quirk v. Commissioner</u>, 928 F.2d 751, 758-759 (6th Cir. 1991), <u>aff'g in part and remanding in part</u> T.C. Memo. 1988-286.  Generally, a stipulation is binding on the parties, and the Court is bound to enforce it.  Rule 91(e); <u>Stamos v. Commissioner</u>, 87 T.C. 1451, 1454 (1986).  Rule 91(e) provides an exception by permitting relief from the binding effect of a stipulation where justice so requires.  The Court generally enforces stipulations unless "manifest injustice" would result.  <u>Bail Bonds by Marvin Nelson, Inc. v. Commissioner</u>, 820 F.2d 1543, 1547 (9th Cir. 1987), <u>aff'g</u> T.C. Memo. 1986-23; <u>see</u> <u>Keenan v. Commissioner</u>, T.C. Memo. 2018-60, at \*5.  Absent manifest injustice, the Court "will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part".  Rule 91(e).

According to the joint stipulation of facts and the joint stipulation of settled issues, petitioner's position is that he is entitled to a miscellaneous itemized deduction for the restitution payments he made in 2014.  On brief petitioner argues that he may deduct the restitution payments under section 162(a) as ordinary and necessary trade or business expenses, under section 165(c)(1) as losses incurred in a trade or business, or under section 165(c)(2) as losses incurred in a transaction entered into for profit.  With respect to the deductions under section 162(a) and

**[*15]** section 165(c)(1) petitioner asserts on brief that "either of these deductions would be taken above-the-line, effectively as negative 'other income'".

However, petitioner's arguments on brief that he is entitled to an above-the-line-deduction for the restitution payments under section 162(a) or section 165(c)(1) are contrary to the parties' stipulations. Miscellaneous itemized deductions, as defined in section 67(b), are reported on Schedule A, Itemized Deductions. Itemized deductions are sometimes called "below-the-line" deductions. Below-the-line deductions, unlike above-the-line deductions, are subject to income limitations and in some instances can be deducted only to the extent they exceed a specified floor amount. Specifically, section 67(a) reduces miscellaneous itemized deductions by 2% of adjusted gross income.

Petitioner does not argue on brief that he should be relieved of the stipulations or that enforcing the stipulations will result in manifest injustice. Therefore, petitioner is bound by the joint first stipulation of facts and the joint stipulation of settled issues. Accordingly, the Court only considers whether petitioner is entitled to a Schedule A miscellaneous itemized deduction (i.e., a below-the-line-deduction) for the restitution payments.

[*16] II.    Miscellaneous Itemized Deduction

The restitution payments are deductible as a miscellaneous itemized deduction if they constitute expenses attributable to the performance of services as an employee under section 162(a), losses related to the performance of services as an employee under section 165(c)(1), or losses incurred in a transaction entered into for profit under section 165(c)(2).  See secs. 62(a)(1), 67(b); sec. 1.67-1T(a)(1)(i) and (ii), Temporary Income Tax Regs., 53 Fed. Reg. 9875 (Mar. 28, 1988).

A.    Unreimbursed Employee Expenses or Losses

Section 162(a) allows a deduction for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Section 165(a) and (c)(1) allows an individual a deduction for any loss incurred in a trade or business.[11]  Section 162(a) expenses and section 165(c)(1) losses related to the performance of services as an employee are deductible only to the extent the employee is not entitled to reimbursement.  Sec. 67(b); sec. 1.67-1T(a)(1)(i), Temporary Income Tax Regs., supra; see Orvins v. Commissioner, 788 F.2d 1406,

------

[11]On brief petitioner argues that his analysis under section 165(c)(1) "is effectively the same as [s]ection 162(a)".

**[\*17]** 1408 (9th Cir. 1986), aff'g T.C. Memo. 1984-533; Lucas v. Commissioner, 79 T.C. 1, 6 (1982); Podems v. Commissioner, 24 T.C. 21, 22-23 (1955).

The Form W-2 FoodPro issued to petitioner shows that he was an employee of FoodPro in 2014. Although the parties stipulated that petitioner was the corporate secretary of GSP at all relevant times in this case, the record does not contain sufficient evidence to determine whether his activity as corporate secretary rose to the level of being an employee of GSP for income tax purposes.[12] Regardless, petitioner has not asserted or proven that he was not entitled to reimbursement for the restitution payments from either FoodPro or GSP.

Even assuming that petitioner was able to prove that either FoodPro or GSP would not have reimbursed him for the restitution payments, he has not proven

---

[12]For income tax purposes a taxpayer may be engaged in a trade or business as an employee solely because of his activity as a director or officer of a corporation. See, e.g., Folker v. Johnson, 230 F.2d 906, 909 (2d Cir. 1956) (finding that a corporate officer who devoted his entire working time to his duties as a corporate officer and who received compensation in the form of a salary was engaged in the trade or business of rendering services for pay); Mitchell v. United States, 408 F.2d 435, 439 (Ct. Cl. 1969) (finding that a taxpayer's activity of being a corporate official of his own corporation was his primary trade or business for purposes of sec. 162 despite his participation and compensation received for acting as an officer and director of other corporations); see also sec. 3121(d)(1) (providing that for employment tax purposes any officer of a corporation is an employee); cf. DePinto v. United States, 407 F. Supp. 1, 2-4 (D. Ariz. 1975) (finding that a taxpayer was not in the trade or business of being a corporate director for purposes of sec. 162 because he lacked a profit objective in such activity), aff'd, 585 F.2d 405 (9th Cir. 1978).

**[*18]** that the restitution payments were ordinary and necessary expenses or represented losses incurred as an employee of FoodPro or GSP. Those payments were in substance a repayment of the loan that GSP obtained through fraudulent means from OPIC. A taxpayer is not entitled to a deduction for repayment of the loan principal because the loan proceeds are not taxable income when they are received. See United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931); Porter v. Commissioner, T.C. Memo. 2015-122, at *32-*33 (and cases cited thereat).

In determining the amount of restitution to impose the District Court, the codefendants, and the Government focused on OPIC's total loss, which was calculated by starting with the aggregate of the two loan disbursements to GSP and adding the payment OPIC made to the contractor to complete the bakery for resale. See supra note 8. The record does not show specifically how the District Court arrived at the restitution amount of $2 million. However, as the Court has inferred, this figure is closer to the restitution amount proposed by petitioner and his codefendants, as adjusted to take into account OPIC's payment to the contractor. The restitution ordered by the District Court, at least in substantial part, repaid the funds that OPIC transferred on the basis of the false and fraudulent statements and omissions by petitioner and his codefendants.

**[*19]** Petitioner relies on <u>Cavaretta v. Commissioner</u>, T.C. Memo. 2010-4, 2010 Tax Ct. Memo LEXIS 5, to support his contention that the restitution payments constitute trade or business expenses or losses. In that case the taxpayer wife, while working for the taxpayer husband's dentistry practice and without his knowledge, submitted false claims to insurance companies for work the taxpayer husband had not performed. <u>Id.</u> at *2. The overcharges were reported as gross receipts on a Schedule C attached to their tax return. <u>Id.</u> One of the insurance companies demanded repayment of the false claims from the taxpayer wife and negotiated a private civil restitution agreement with her. <u>Id.</u> at *2-*3, *16. The taxpayer husband repaid the money and deducted the repayments as Schedule C business expenses. <u>Id.</u> at *4.

The Court allowed a deduction for the restitution payments under section 162 as ordinary and necessary business expenses relying primarily on two principles. First, the Court held that the restitution payments were payments in settlement of a contract claim between the taxpayer husband's Schedule C business and the insurance company. <u>Id.</u> at *14. The Court relied on the taxpayer husband's testimony that he would have lost his business if he had not settled with the insurance company. <u>Id.</u> Second, the Court found that even if the Schedule C business did not have a contractual obligation to repay the insurance company,

**[\*20]** payments made to satisfy claims against a third party (i.e., the taxpayer wife) were also ordinary and necessary business expenses of the taxpayer husband's Schedule C business. Id. at \*15. Cavaretta does not support petitioner's argument that the restitution payments are deductible under section 162(a) or section 165(c)(1).

Unlike the taxpayer in Cavaretta, petitioner did not have a Schedule C trade or business and did not report any amount of the restitution in his gross income. Instead, petitioner seeks to claim a deduction for expenses he attributes to the trade or business of FoodPro or GSP. Neither petitioner nor the record establishes that either FoodPro or GSP should be treated as passthrough entities.

Under a limited exception, a taxpayer's payment of another party's business expense is deductible if: (1) the taxpayer's primary purpose or motive was to protect or promote his own trade or business and (2) the expense is an ordinary and necessary expense of his trade or business. Lohrke v. Commissioner, 48 T.C. 679, 688 (1967); see Zavadil v. Commissioner, 793 F.3d 866, 871 (8th Cir. 2015), aff'g T.C. Memo. 2013-222; Capital Video Corp. v. Commissioner, 311 F.3d 458, 464 (1st Cir. 2002), aff'g T.C. Memo. 2002-40; Betson v. Commissioner, 802 F.2d 365, 368 (9th Cir. 1986), aff'g in part, rev'g in part T.C. Memo. 1984-264. The taxpayer bears the burden of showing "a direct nexus between the purpose of the

**[*21]** payment and the taxpayer's business or income producing activities".

Dietrick v. Commissioner, 881 F.2d 336, 339 (6th Cir. 1989) (citing Lettie Page

Whitehead Found., Inc. v. United States, 606 F.2d 534, 538 (5th Cir. 1979)), aff'g

T.C. Memo. 1988-180; see Bone v. Commissioner, 324 F.3d 1289, 1295 (11th Cir.

2003), aff'g T.C. Memo. 2001-43; Betson v. Commissioner, 802 F.2d at 368.

In other words for the restitution payments, whether attributable to FoodPro

or GSP and without deciding whether they are business expenses to either entity,

to be deducted by petitioner as miscellaneous itemized deductions he must prove

that: (1) the restitution payments arose in connection with petitioner's trade or

business of being an employee of FoodPro or GSP, (2) his primary purpose or

motive for making the restitution payments was to protect or promote his trade or

business of being an employee of FoodPro or GSP, and (3) the restitution

payments must be ordinary and necessary expenses of being an employee of

FoodPro or GSP.

Petitioner has not shown how the restitution payments promoted or

protected his trade or business of being a FoodPro employee. Petitioner has not

shown that as GSP's corporate secretary he was an employee of GSP for income

tax purposes. Petitioner has not presented any evidence of his primary purpose or

motive for making the restitution payments, other than that he was obligated to do

[*22] so as part of his sentencing. Further, as discussed above, petitioner has not shown that the restitution payments were ordinary and necessary expenses or losses of being an employee of FoodPro or the corporate secretary of GSP. Accordingly, for the reasons discussed above, the Court concludes that petitioner may not deduct the restitution payments under section 162(a) or 165(c)(1).

B.      Loss in Transaction Entered Into for Profit

Section 165(c)(2) allows an individual a deduction for any losses incurred in any transaction entered into for profit, though not connected with a trade or business, and not compensated for by insurance or otherwise. Section 165(c)(2) losses are miscellaneous itemized deductions to the extent that they are not casualty or theft losses. See sec. 67(b)(3).

The parties devote a significant amount of time discussing whether the restitution payments were primarily compensatory or punitive in nature for purposes of determining whether the restitution payments are deductible under section 165(c)(2). See Waldman v. Commissioner, 88 T.C. 1384, 1387 (1987), aff'd, 850 F.2d 611 (9th Cir. 1988); Huff v. Commissioner, 80 T.C. 804, 824 (1983); S. Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 652 (1980); Cavaretta v. Commissioner, 2010 Tax Ct. Memo LEXIS 5, at *11-*13. However, the parties assume that petitioner sustained a loss, presumably arising from the payments of

[*23] restitution, in a transaction he entered into for profit in his individual capacity. On that basis the parties disagree as to whether the allowance of that deduction would "frustrate sharply defined national or state policies proscribing particular types of conduct". Commissioner v. Tellier, 383 U.S. 687, 694 (1966) (quoting Commissioner v. Heininger, 320 U.S. 467, 473 (1943)); see Ginsburg v. Commissioner, T.C. Memo. 1994-272, 1994 Tax Ct. Memo LEXIS 285, at *7. The Court does not need to address whether the restitution payments were compensatory or punitive in nature because petitioner has failed to prove that he engaged in a transaction entered into for profit in his individual capacity.

Before a taxpayer is entitled to deduct a loss under section 165(c)(2), he must demonstrate that he has entered into a transaction the primary purpose of which was to make a profit. See Fox v. Commissioner, 82 T.C. 1001, 1018-1021 (1984). The business that an officer conducts for a corporation is not his own business. Burnet v. Clark, 287 U.S. 410, 415 (1932); Dalton v. Bowers, 287 U.S. 404, 409-410 (1932); Weigman v. Commissioner, 47 T.C. 596, 604-606 (1967), aff'd per curiam, 400 F.2d 584 (9th Cir. 1968); Wilson v. Commissioner, 40 T.C. 543, 550 (1963); Hudlow v. Commissioner, T.C. Memo. 1971-218, 1971 Tax Ct. Memo LEXIS 114, at *27.

[*24] Petitioner, in his capacity as the corporate secretary of GSP, submitted the loan application to OPIC on behalf of GSP to obtain the loan to establish its milling and bakery operation in Estonia. Petitioner, in his capacity as president of FoodPro, misrepresented Food Pro's investment contribution to GSP. GSP presumably entered into this operation with the intent of reaping profits, which would in turn be passed on to its shareholders including FoodPro. But any profits from the milling and bakery operation would have been earned by GSP, not petitioner. Further, as discussed supra pp. 17-18, the restitution was intended to compensate OPIC for the loss related to the loan between OPIC and GSP. GSP, not petitioner, operated the milling and bakery business in Estonia. Petitioner has not shown that he was engaged in a transaction entered into for profit. Accordingly, the Court holds that petitioner is not entitled to claim a deduction for the restitution payments under section 165(c)(2).

The Court sustains the Appeals Office's determination in the notice of determination and holds that petitioner's restitution payments are not deductible as a miscellaneous itemized deduction under section 162(a) or 165(c)(1) or (2).

In reaching the conclusions described herein, the Court has considered all arguments made, and, to the extent not mentioned above, the Court finds them moot, irrelevant, or without merit.

**[*25]** To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.